UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| Plaintiff, : | |
| : | |
| vs. : | Crim. No. 3:05cr291 (PCD) |
| : | |
| JEROME BALDWIN, : | |
| Defendant. : | |

**RULING ON MOTION TO SUPPRESS**

Defendant moves, pursuant to the Fourth Amendment and Rule 12 of the Federal Rules of Criminal Procedure, to suppress from evidence all fruits of the searches of his vehicle and his person conducted by law enforcement officers on September 4, 2005, on the grounds that the searches and seizures were undertaken without reasonable suspicion, probable cause or warrant in violation of Defendant's constitutional right to be free from unreasonable searches. For the reasons stated herein, Defendant's Motion to Suppress [Doc. No. 19] is **denied**.

**I.    BACKGROUND**[1]

A grand jury returned, on January 18, 2006, a three-count superseding indictment against defendant Jerome Baldwin ("Baldwin"), charging him with possession of firearms by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), possession with intent to distribute 5 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and using and possessing a firearm during, in relation to, and in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Gov't Mem. Opp. at 3; Def. Mot. Suppress at 1. These

---

[1]  The account that follows is taken from the briefs submitted by the Government and by Defendant in support and in opposition to the Motion to Suppress. Additional facts, as needed, will be discussed in subsequent sections.

charges arise from events occurring on September 4, 2005.

On September 4, 2005, New Haven Police received an anonymous tip that two black males, one of whom was wearing a white t-shirt, were both in possession of firearms and were standing next to a grey or silver Chevrolet Impala bearing Virginia license place at the area of Downing and Bailey Streets in New Haven, Connecticut. The responding officers, Donnelly and Plowman, responded to the call by going to the area described, arriving at the location at approximately 2:37 p.m. They saw no one at the corner of Downing and Bailey Streets. After proceeding southbound on Downing Street, however, the officers were passed by an oncoming vehicle which they observed to be a silver 2001 Chevrolet Impala with a Virginia license plate on the rear. Although the officers were unable to determine whether anyone was in the passenger seat, they were able to get a clear look at the driver, who appeared to be a black male wearing a black t-shirt (later identified as Jerome Baldwin).

The police officers, who were in police uniforms and in a marked police car, reversed direction, activated their overhead lights and siren, and attempted to pull the vehicle over. See Gov't Mem. Opp. at 3 (citing Donnelly Case Incident Report, attached as Gov't Exh. A); Def. Mot. Suppress at 2. Baldwin briefly stopped the car in response to the police command to do so. As the car was stopped, the officers approached the car on foot. They ordered Baldwin to show his hands and when, after three orders, they received no response, they drew their service weapons. Baldwin sped away in the car and a high-speed chase ensued, during which the officers pursued the car until it crashed at the bottom of the exit ramp for exit 7 off I-91. An individual sitting in the passenger side (wearing a white t-shirt) jumped out of the car window and over a nearby fence; he was not apprehended. Baldwin was also observed fleeing on foot but

was soon apprehended and arrested.

Baldwin, upon being apprehended, provided his name to the officers and had identification on his person.  A search of Baldwin incident to his arrest revealed that he was carrying a black mask which covered his head and part of his face.  In his wallet, Baldwin had numerous credit cards, a Virginia state driver's license bearing the name "Jerome Baldwin," and a note reading "Hi-Point Mansfield-Ohio, Model C, 9MM, 9MM Ammunition too."  Gov't Mem. Opp. at 6 (citing Donnelly Report at 9, attached as Gov't Exh. A).

From Defendant's car, reportedly "in plan view on the front passenger area," the police seized a Masterpiece Arms .45 caliber automatic firearm.  Gov't Mem. Opp. at 6 (citing Mazzola Bureau of Identification Report, attached as Gov't Exh. D); Def. Mot. Suppress at 2.  The firearm had a round in the chamber and a magazine with 30 rounds of .45 caliber ammunition in it and the safety was on.  The officers then proceeded to search the rest of the vehicle, finding in the glove box a clear plastic bag containing 67 small white clear ziplock bags of what appeared to be, and what was later revealed to be, crack cocaine.  The officers also found, in the trunk, a Savage 20 gauge pump action shotgun and two backpacks, which contained, among other things, a box of .45 caliber ammunition and a speed loader for the .45 caliber pistol and a HiPoint Model C 9mm semi-automatic handgun.  A check of DMV records showed the 2001 Chevrolet Impala, VA registration JCG-8214 to be registered to Jerome Baldwin.  See Gov't Mem. Opp. at 6 (citing Donnelly Report at 8-9, attached as Gov't Exh. A); Def. Mot. Suppress at 2.

II.   **DISCUSSION**

Defendant argues that the police did not have reasonable suspicion to stop Baldwin's vehicle and that the resulting stop, even if brief, was an unlawful seizure.  Accordingly,

Defendant contends that the subsequent search of Defendant's vehicle after the chase and seizure of the firearms and narcotics constituted the fruits of the unlawful seizure. Because it is not found that the first "stop" was a seizure within the meaning of the Fourth Amendment, the Court need not determine whether the police officers initially had reasonable suspicion to stop Baldwin's vehicle.

Supreme Court and Second Circuit case law makes clear that the police officers' initial attempt to stop Defendant was not a "seizure" under the Fourth Amendment. The Supreme Court's decisions in California v. Hodari D., 499 U.S. 621, 624 (1991), and a subsequent case, County of Sacramento v. Lewis, 523 U.S. 833, 844 (1998), have established the rule that "an order to stop must be obeyed or enforced physically to constitute a seizure." See United States v. Swindle, 407 F.3d 562, 572 (2d Cir. 2005). The Hodari D. Court held that "with respect to a show of authority," a seizure does not occur if "the subject does not yield." A seizure requires "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority;" a seizure does not occur when "a policeman yell[s] 'Stop, in the name of the law!' at a fleeing form that continues to flee." Id. at 626 (emphasis in original). Similarly, in Lewis, the Court said that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." 523 U.S. at 844. Put simply, "attempted seizures of a person are beyond the scope of the Fourth Amendment." Id. at 845 n.7.

Following the rules established in those cases, it appears that there was no seizure in this case until the officers physically apprehended Defendant after he crashed his car at the bottom of the exit ramp for exit 7 off I-91. The officers who attempted to stop Defendant clearly made a show of authority when they activated their patrol lights and were initially able to pull

Defendant's vehicle over.  What was missing at that point, however, was Defendant's *submission* to the officers' show of authority.  Shortly after the officers emerged from the patrol car on foot, Defendant drove away, forcing the officers into a high-speed chase down I-91.  Without physical force or at least clear submission to a show of authority, the Court cannot find that there was any seizure at that point.

Defendant's conduct in this case is not unlike that of the defendant in Swindle, 407 F.3d 562.  As does Defendant in this case, Swindle contended that "he was seized when the officers activated their police light because no reasonable driver would have felt free to ignore the stop."  Id. at 571.  Swindle also refused to obey the order to stop; he continued to drive, threw a bag of drugs out of his trunk, eventually stopped the vehicle and ultimately fled on foot, only to be apprehended soon after.  Id. at 565.  The Second Circuit held, citing the rule established by Hodari D. and Lewis, that no seizure had occurred:

> Swindle was not seized until the police physically apprehended him, and therefore [] the drugs did not have to be suppressed as the fruit of a poisonous tree.  Regardless of how unreasonable it was for the officers to order him to pull over, and regardless of how reasonable it was for Swindle to have felt restrained in the face of the flashing police strobe light, there was no immediate "physical force" applied or "submission to the assertion of authority."

Id. at 572-73 (quoting Hodari D., 499 U.S. at 626) (internal citations omitted).  The only difference in this case is that here, Baldwin initially pulled over in response to the officers' show of authority, whereas Swindle never complied in any extent with the order to stop.  This action, however, fails to change the analysis.  Regardless of what Baldwin's initial motivations were in pulling over his car, he never submitted to the officers' show of authority and therefore was never seized.  A defendant cannot circumvent the clearly established rule simply by stopping

5

briefly before fleeing from the police. See United States v. Washington, 12 F.3d 1128, 1132 (D.C. Cir. 1994) (holding that "[a]lthough a reasonable person would not have believed that she was free to continue driving once [the officer] activated his sirens," and even though the defendant initially did stop, because "he drove off quickly before the [the officer] even reached the car," he "did not submit" and therefore "was not seized within the meaning of the Fourth Amendment").

Because "an unreasonable order to stop does not violate the Fourth Amendment" and "the grounds for a stop may thus be based on events that occur after the order to stop is given," we need not decide whether the officers initially had reasonable suspicion to order Baldwin to pull over. See Swindle, 407 F.3d at 568 (citing Hodari D., 499 U.S. at 629). Assuming that the officers issued an unreasonable order to stop, the only question for Fourth Amendment purposes is whether reasonable suspicion existed at the moment Baldwin was finally apprehended. Id. It is clear that Baldwin's pre-seizure behavior—including fleeing from police, the operation of his vehicle, crashing his vehicle and running away on foot—generated reasonable suspicion for his ultimate apprehension. Accordingly, the fact that the officers' initial order to stop may have been unreasonable is irrelevant for Fourth Amendment purposes. See id.; see also Hodari D., 499 U.S. at 629 (implicitly authorizing a defendant's seizure based on events occurring after police officers issue an unreasonable order to stop). Because Baldwin was not "seized" until the officers physically apprehended him, the evidence recovered during the searches of his vehicle and his person conducted by law enforcement officers on September 4, 2005 does not have to be suppressed as fruits of the poisonous tree. Swindle, 407 F.3d at 572.

**III.   CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress [Doc. No. 19] is **denied**. Accordingly, the evidence recovered during the searches of Defendant's vehicle and his person on September 4, 2005 does not have to be suppressed.

SO ORDERED.

Dated at New Haven, Connecticut, April  7 , 2006.

/s/
Peter C. Dorsey, U.S. District Judge
United States District Court